**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
ANA FONTES,                             )
                                        )
            Plaintiff,                  )
                                        )          Civil Action
        v.                              )          No. 19-10772-PBS
                                        )
ANDREW SAUL,                            )
Commissioner of the Social Security     )
Administration,                         )
                                        )
            Defendant.                  )
_____)

**MEMORANDUM AND ORDER**

December 6, 2019

Saris, C.J.

**INTRODUCTION**

Plaintiff Anna Fontes brings this action under 42 U.S.C. §
405(g) for judicial review of a final decision denying her
application for Social Security Disability Insurance ("SSDI")
benefits.[1] Plaintiff suffers from various physical and mental
impairments including major depressive disorder, anxiety
disorder, panic disorder, cervical occipital neuralgia,[2] history

---

[1] The plaintiff filed suit against Nancy Berryhill in her official capacity as
the Acting Commissioner of the Social Security Administration. Andrew M. Saul
succeeded Berryhill as Commissioner and is therefore substituted as the
defendant pursuant to Fed. R. Civ. P. 25(d).
[2] Cervical occipital neuralgia is pain along one or more nerves in the neck.
Id. at 1262.

1

of chronic left chronic otitis media,[3] and status post left tympanoplasty.[4] She argues that the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC") findings were not supported by substantial evidence.

For the reasons set forth below, the Court **DENIES** Plaintiff's motion to reverse the Commissioner's decision. (Docket No. 10) and **ALLOWS** Defendant's motion to affirm the Commissioner's decision (Docket No. 13).

## FACTUAL BACKGROUND

Plaintiff Ana Fontes ("Plaintiff") was 52 years old when she filed her application for SSDI on March 19, 2018. R. 15, 50. She had previously worked as an industrial cleaner, cell coordinator, and material handler. R. 65. Plaintiff alleged disability due to major depressive disorder, anxiety disorder, panic disorder, cervical occipital neuralgia, history of chronic left chronic otitis media, and status post left tympanoplasty. Docket No. 1 at 2.

### I.   **Medical History**

Plaintiff's alleged onset date of disability was December 14, 2017, the date of her ear surgery. R. 15. Over the next year, Plaintiff would receive medical care from the Massachusetts Eye

---

[3] Left chronic otitis media is inflammation of the left middle ear. Id. at 1351.
[4] A tympanoplasty is a surgical reconstruction of the hearing mechanism of the ear. Dorland's Illustrated Medical Dictionary 1993 (32nd ed. 2011).

and Ear Infirmary, Hawthorn Medical Associates, and the Spaulding Rehabilitation facility.

On December 22, 2017, Plaintiff had a post-surgery visit at the Massachusetts Eye and Ear Infirmary. Care providers noted that Plaintiff had a persistent earache, despite oral antibiotics. Plaintiff stated that her hearing had gradually worsened, and that she felt dizzy when bending over or turning her head quickly. R. 399. On February 2, 2018, Plaintiff attended a follow up visit at the same provider. Notes from the appointment indicate that Plaintiff's hearing had improved, but she was still bothered by dizziness. R. 407. She was given a referral to vestibular[5] physical therapy. R. 409.

On February 21, 2018, Plaintiff had an appointment at Hawthorn Medical Associates. Documentation from Plaintiff's appointment noted that she was having abdominal pain of an unknown cause. R. 307.

On March 22, 2018, Plaintiff went to Spaulding Rehabilitation for an initial physical therapy evaluation. Plaintiff reported a history of six surgeries related to her left tympanic membrane.[6] She described dizziness, headaches, tinnitus, and imbalance

---

[5] "The vestibular system includes the parts of the inner ear and brain that help control balance and eye movements." Symptoms, VeDA, https://vestibular.org/understanding-vestibular-disorder/symptoms (last visited Oct. 29, 2019).

[6] Tympanic surgical procedures treat the ear drum. Dorland's Illustrated Medical Dictionary 586 (32nd ed. 2011).

triggered by looking down and changing position. R. 606. She was enrolled in physical therapy for six weeks. R. 608.

At a physical therapy session at Spaulding Rehabilitation on March 26, 2018, Plaintiff reported feeling unsafe on her feet due to dizziness. R. 604. She also stated that her pain was always at a five out of ten. Id. Finally, Plaintiff reported that she had little to no tolerance to noise or light. Id.

On April 2, 2018, Plaintiff had a follow up appointment at Massachusetts Eye and Ear Infirmary, where she stated that she felt imbalanced when moving, could not dance, and experienced tunnel vision when driving down long and straight roads. R. 413. During her appointment, Plaintiff indicated that she had not experienced any improvement after several physical therapy sessions. Id. Upon examination, she was noted to have normal speech and language function, grossly normal memory and attention, and a very stiff neck with difficulty turning her head. Plaintiff's gait and balance were abnormal. R. 413-414. Plaintiff was referred for vestibular testing. R. 413.

Upon follow up at Spaulding Rehabilitation facility in April 2018, Plaintiff noted no improvement to her symptoms. R. 602. She continued to attend her physical therapy treatment sessions over the following three months, but she reported continued headaches, dizziness, and balance impairments during this period. R. 582-602.

One month later, on May 9, 2018, at her follow up appointment
at Hawthorn Medical Facility, Plaintiff noted sharp pains on the
right side of her head and requested a referral for a
neurologist. R. 571, 574. She was given the requested referral,
and was advised to quit smoking. R. 574-575.

On June 19, 2018, Plaintiff had an ENT (ears, nose, and
throat) appointment at Southcoast Health. Documentation from her
appointment noted her left ear was "healing well," although she
had continued trouble with balance. R. 621. Plaintiff's results
were normal after table testing and vestibular testing. The
cause of her ongoing symptoms was reportedly unknown. She
reported difficulty in swallowing and was strongly encouraged to
quit smoking. R. 622.

Plaintiff attended physical therapy at Spaulding
Rehabilitation on June 21, 2018. R. 585. Notes from the session
indicate that the Plaintiff had been "gardening and doing light
duty yard work for short periods." R. 586.

Based on Plaintiff's self-assessment on July 11, 2018, her
physical therapist noted that she had not had any changes in
symptoms since starting physical therapy, and had experienced
ongoing headaches, dizziness, limited eye movement, balance
impairment, and pain. Her physical therapist also noted that
Plaintiff had little to no tolerance to noise and pressure

changes, and that she limited any strenuous activity. Plaintiff
was discharged with a home exercise program. R. 584.

On July 19, 2018, Plaintiff was examined by an ophthalmologist
for a routine eye exam. R. 613. She was noted to have 20/20
vision with corrective lenses. R. 616.

On July 26, 2018, Plaintiff went to Hawthorn Medical
Associates for a sick visit. Plaintiff was assessed with
pharyngitis and constipation, and was advised to use a saline
spray and zinc lozenges and to increase fluid intake. R. 541.

Plaintiff's impacted ear wax was examined in a visit at
Southcoast Health on August 2, 2018. R. 629.

On August 13, 2018, Plaintiff had a neurology appointment at
Hawthorn Medical Associates. R. 639. Plaintiff reported numbness
and tingling in her neck. R. 641. Her provider noted that
Plaintiff had significant occipital neuralgia, which can cause
fleeting head pains and intermittent blurry vision. R. 642. She
was advised to massage, stretch, and use heat on her neck. R.
642. The provider also referred Plaintiff for an MRI of a benign
cerebral tumor, which the provider explained was not the cause
of Plaintiff's head pains. R. 643. The physician declined to
prescribe muscle relaxers for the Plaintiff's neck pain, because
Plaintiff was drinking four glasses of wine per night. R. 642.
Documentation from Plaintiff's August 13, 2018 appointment also

noted that Plaintiff had been smoking one and a half packs of cigarettes per day. R. 642.

On September 10, 2018, Plaintiff had a neurology appointment with Dr. Conroy, in the neurology department of Hawthorn Medical Associates. R. 634. Plaintiff complained of significant neck pain and tinnitus. Dr. Conroy noted that Plaintiff possibly had occipital neuralgia and "a lot of psychosocial stress." R. 637. Plaintiff was advised that she would benefit from some therapy for her neck but was reportedly resistant to this treatment. Id. Dr. Conroy noted that Plaintiff had been prescribed a "modest dose of Lexapro 5mg and [a] small dose of Xanax" to take at bedtime. Plaintiff reported that she was taking the Xanax three to four times per day. R. 637. Dr. Conroy noted that the Xanax may have suppressed Plaintiff's vestibular input. Plaintiff was reassured that her benign cerebral tumor was stable and did not need to be addressed at that time. R. 637.

On October 12, 2018, Plaintiff went to the Massachusetts Eye and Ear Infirmary. R. 645. She reported dizziness, headaches, blurred vision, ear pain, and anxiety. Id. Results from Plaintiff's ENG[7] and rotational chair testing were normal, and

---

[7] ENG testing is electronystagmography, which is a diagnostic technique for recording extracellular activity of skeletal muscles. Id. at 602.

her MRI showed no interval growth. R. 646. She was advised to follow up in one year. Id.

## II.  **Psychiatric Treatment History**

Plaintiff has met with Nurse Practitioner Claire Olivier once a week to once every two months, depending on the severity of Plaintiff's needs, since October 21, 2009. R. 529. Nurse Practitioner Olivier offers individual psychotherapy and medication management. Id.

On February 21, 2018, Plaintiff had an appointment with Nurse Practitioner Olivier. R. 449. She discussed her December 2017 ear surgery, which she felt was a "mess". Id. She also discussed feeling sadness related to the recent loss of a friend. Id. Plaintiff expressed fear that she would not be able to return to her job, which required driving machinery. Id. Plaintiff also mentioned tension at her workplace, explaining that it was no longer a family-oriented place. Id. Nurse Practitioner Olivier recorded that Plaintiff had good eye contact, soft speech, goal-oriented thought processes, no abnormal thought content, intact memory, intact attention, and intact insight/judgement. R. 450. She was diagnosed with major depressive disorder and panic disorder. R. 452. Plaintiff was assessed to have a Global Assessment of Functioning ("GAF") score of 55.[8] Id.

---

[8] GAF scores measure how much a person's psychological symptoms limit their daily activities. A GAF score between 51 to 60 describes moderate symptoms that cause moderate limitations in occupational functioning. See Garrison v.

During Plaintiff's next visit with Nurse Practitioner Olivier on March 5, 2018, Olivier described Plaintiff as agitated and pacing because her daughter "trashed" Plaintiff's apartment. R. 323. Plaintiff expressed continued concern about her ear. Id. Plaintiff stated that she wanted to clean houses like she used to, because it was "calmer" then. Id. Plaintiff's examination findings, diagnoses, and GAF score remained constant. R. 326.

Plaintiff subsequently visited Nurse Practitioner Olivier on March 23, 2018. R. 318. Plaintiff reported experiencing tinnitus, blurry vision, and dizziness. Id. Plaintiff also explained that her daughter was now living with her. Id. Plaintiff's examination findings, diagnoses, and GAF score remained stable, and it was noted that she presented as "calmer." Id.

At a April 9, 2018 appointment, Plaintiff discussed feeling depressed. R. 434. Plaintiff reported tinnitus, blurry vision, and pain on the left side of her head. Id. Nurse Practitioner Olivier recorded that Plaintiff expressed not wanting to do anything and that Plaintiff was "isolating at home more

---

Colvin, 759 F.3d 995, 1002 n.4 (9th. Cir. 2014) ("According to the DSM-IV, a GAF score between 41 and 50 describes 'serious symptoms' or [']any serious impairment in social, occupational, or school functioning.' A GAF score between 51 to 60 describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning.' Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement.").

frequently." Id.  Plaintiff also discussed a recent surge of traumatic memories from childhood. Id.

Plaintiff's next appointment was on May 3, 2018. R. 524. Plaintiff reported feeling anxious and depressed due to her ongoing health situation. Id. Plaintiff noted that she was entirely unable to hear out of her left ear. Id. Nurse Practitioner Olivier's notes mention that Plaintiff was pushing herself to go out, but that poor focus prevented her from reading. Id. Plaintiff discussed ongoing stress related to her daughter, who was living with Plaintiff. Id.

On June 4, 2018, at a visit with Nurse Practitioner Olivier, Plaintiff reported ongoing stress, depression and anxiety due to the treatment of her ear. R. 519. Plaintiff stated that she had been crying for the past few days and had poor appetite and poor sleep. Id. Plaintiff also mentioned that she had been pushing herself to go out, such as going to a wedding during the previous weekend. Id.

At Plaintiff's next visit, on July 19, 2018, she reported ongoing stress due to her ear condition and difficulty swallowing. R. 562. Plaintiff initially stated that she had been isolative, but later reported that she had spent time with friends. Id. Plaintiff also stated that she had been drinking more wine and mentioned that she had been having flashbacks and nightmares related to childhood trauma. Id.

On August 31, 2018, Plaintiff had a follow up visit with Nurse Practitioner Olivier, where she noted she was having flashbacks to childhood trauma. R. 558. She discussed increased alcohol consumption and continued problems with her daughter. Id.

Just over a month later, on October 4, 2018, Plaintiff discussed the recent loss of a friend with Nurse Practitioner Olivier. R. 554. Plaintiff also reported that she was drinking wine most nights and she was getting out of the house once or twice per week to help her 94-year-old neighbor. Id.

On November 5, 2018, Plaintiff discussed with Nurse Practitioner Olivier the loss of her ability to work, and her fear for her future. R. 550. She also discussed her upcoming SSDI hearing. Id. Nurse Practitioner Olivier's notes stated that Plaintiff was unable to return to work "due to severity of both physical and emotional pain." R. 552. The notes also indicated that Plaintiff was "unable to operate machinery which is required of her job." Id.

## III. **State Agency Medical Consultant Evaluations**

On May 8, 2018, Dr. John Warren, an advising psychologist to the Disability Determination Service (DDS), evaluated Plaintiff's medical record. R. 106. Dr. Warren assessed that Plaintiff had severe medical impairments related to depression and anxiety, but no severe physical impairments. R. 107. Dr. Warren concluded that Plaintiff would have, due to mental

impairment, a mild limitation in the ability to understand, remember or apply information, a moderate limitation in interacting with others, a moderate limitation in the ability to maintain concentration and persistence, and a moderate limitation in the ability to adapt or manage oneself. Id. Dr. Warren further concluded that Plaintiff could carry out simple tasks over a routine workday and workweek with acceptable attention, persistence, and pace. R. 109-110. He wrote that Plaintiff could relate adequately to supervisors and coworkers given limited contact with the public, and that Plaintiff could adapt to routine workplace changes. R. 112.

On August 7, 2018, Dr. Carol McKenna, an advising psychologist to DDS, conducted a reconsideration of Plaintiff's medical record. R. 122. Dr. McKenna assessed that Plaintiff would have moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, and completing a normal workday and workweek. R. 124.

IV.   **Treating Psychiatrist Evaluation**

On July 20, 2018, Nurse Practitioner Olivier completed a mental impairment questionnaire on Plaintiff's behalf, noting diagnoses of major depression and panic disorder with a GAF score of 50-55. R. 529, 532. The Nurse Practitioner noted that Plaintiff's ability to manage stress in work settings had varied

over the years, and that Plaintiff had required "a lot of FMLA."
R. 530.

On November 10, 2018, Nurse Practitioner Olivier completed a
second mental health impairment questionnaire on Plaintiff's
behalf, noting a GAF score between 55 and 70 during the previous
year. R. 544, 549. The Nurse Practitioner wrote that Plaintiff's
daily symptoms interfered with her ability to perform the
factory work she had been engaged in prior to her December 2017
surgery. R. 546. Nurse Practitioner Olivier also found that
Plaintiff reported an increase in her pain, tinnitus, and
dizziness when she is more anxious or panicked. R. 547.

## V.    **Plaintiff's Testimony**

Plaintiff submitted a function report to the Commission in
April 2018. R. 250, 257. In the report, Plaintiff reported
several daily activities including planting flowers, washing
dishes, watching television, and cooking for herself. R. 252,
254. Plaintiff also wrote that her illnesses prevent her from
dancing and affect her sleeping. R. 251. Plaintiff wrote that
she avoids going out because she does not want to be around
people or noise, but that she is able to shop in stores and pay
her bills.  R. 253.

On January 3, 2019, Plaintiff appeared and testified at a
hearing before the ALJ in Boston, Massachusetts. R. 42.
Plaintiff stated that she had experienced recurrent headaches,

dizziness, vestibular dysfunction, and loss of hearing. R. 47, 55. She noted that she has had her left eardrum replaced on two occasions, most recently on her alleged onset date, December 14, 2017. R. 53. She noted that her equilibrium had been "off" since her most recent surgery, causing vertigo and periods of dizziness. R. 54. Plaintiff indicated that she now experiences an echo affect when hearing, and she felt that the December 2017 surgery was not successful. R. 54-55.

Plaintiff told the ALJ that she isolates herself and has trouble with loud noises and crowds of people. R. 56. She noted that, prior to her onset date, she would leave work when she felt overwhelmed due to symptoms of anxiety. R. 59. Plaintiff attested that she doesn't want to "disappoint" others if she cannot work due to her mental wellbeing. R. 66. She also noted that she experiences significant sleep disturbances that cause her to wake up for the day at approximately 3:00 AM each morning. R. 79.

### VI.  **Vocational Expert's Testimony**

Vocational expert Dr. Amy Vercillo testified at the January 3, 2019 hearing before the ALJ. R. 82. Dr. Vercillo opined that a hypothetical person with the abilities and limitations described by the ALJ, considering Plaintiff's testimony and medical history, could work in several positions. The positions available to that hypothetical person included office cleaner,

bench assembler, tagger and labeler, laundry laborer and folder, machine feeder, and hand packer. R. 86-89.  Dr. Vercillo said that absenteeism at two days per month would be considered excessive by most employers and not be tolerated, R. 89-90, and while absenteeism one day a month is above average, it would not be preclusive of employment, R. 96.

## PROCEDURAL HISTORY

Plaintiff filed an application for SSDI on March 19, 2018, alleging disability commencing December 14, 2017. Docket No. 11 at 1. Following the denial of her claim, initially and at the reconsideration level, Plaintiff requested a hearing which was held on January 3, 2019 before Administrative Law Judge Alexander Klibaner in Boston, Massachusetts. Id. at 1-2. On January 15, 2019, Judge Klibaner issued a decision finding that Plaintiff was not disabled. R. 31.

Plaintiff's request for review was denied by the Appeals Council on March 27, 2019. Docket No. 11 at 2. Plaintiff filed this action against Nancy Berryhill, in her official capacity as Acting Commissioner of the Social Security Administration, on April 22, 2019. Docket No. 1.

## AGENCY DECISION

The ALJ issued his decision on January 15, 2019. R. 12-31. First in his analysis, the ALJ found that Plaintiff had not engaged in substantial gainful work activity since December 14,

2017. R. 18. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is usually done for pay or profit, whether a profit is realized or not. 20 C.F.R. § 404.1572(b).

Second, the ALJ found that Plaintiff suffered from several severe impairments: major depressive disorder, anxiety disorder, panic disorder, cervical occipital neuralgia, history of chronic left chronic otitis media, and status post left tympanoplasty. R. 18. Plaintiff's impairments were "severe" because they significantly limited Plaintiff's ability to perform basic work activities. 20 C.F.R. § 416.920(c).

Third, in determining the severity of Plaintiff's conditions, the ALJ looked to regulations specific to disturbance of labyrinthine vestibular function and the neurological system. R. 19. The ALJ found that Plaintiff did not have an impairment or a combination thereof that met or equaled the severity of one of the impairments listed in the regulations. See 20 C.F.R. §§ 404. 1520(d), 404.1525, 404.1526.

Prior to step four, the ALJ determined Plaintiff's residual functional capacity ("RFC"). An individual's RFC is their ability to do physical and mental work activities on a sustained basis despite limitations from their impairments. 20 C.F.R. § 404.1520(e). In making this finding, the ALJ considers all

Plaintiff's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1520(e), 404.1545.

The ALJ assessed that Plaintiff has a mild limitation in understanding, remembering or applying information; a moderate limitation in interacting with others; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself. R. 19-20. The ALJ determined that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: "she could carry out simple, routine tasks, defined to include unskilled tasks that take no more than a month to learn the techniques, acquire the information, and develop the facility needed for average performance of those tasks. [Plaintiff] could carry out those tasks for two-hour periods throughout a forty-hour workweek." R. 21.

The ALJ also found that Plaintiff could tolerate "occasional, superficial interactions with the general public" and "occasional, routine workplace change"; that she could "occasionally climb stairs and ramps, but never ladders, ropes, or scaffolds"; that Plaintiff could not tolerate loud noise[9]; and

---

[9] The ALJ's decision reads that Plaintiff "could tolerate loud noise," R. 21, whereas his Vocational Expert hypothetical prescribes that she "cannot tolerate loud noise," R. 86. This difference was the result of a scrivener's error as the ALJ's decision is consistent with the conclusion that plaintiff could not tolerate loud noises. See R. 88.

that the Plaintiff "would be off task five-percent of the time in addition to normal breaks." R. 21.

At step four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. R. 29. "Past relevant work" means work performed within the last fifteen years or fifteen years prior to the date that disability is established. 20 C.F.R. § 404.1520(f).

At step five, the ALJ found that, given her RFC, the Plaintiff can perform jobs that exist in significant numbers in the national economy, such as hand packager, laundry laborer/folder, and machine feeder. R. 29-31. The ALJ concluded that Plaintiff was not disabled under the Social Security Act. R. 29-31; see also 20 C.F.R. § 404.1520(g).

## LEGAL STANDARDS

### I.    Statutory and Regulatory Framework

Under the Social Security Act, a claimant seeking benefits must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)(2012). To meet this definition, a person must have a severe impairment that renders her unable to do her past relevant work or any other substantial gainful work that exists in the national economy. 20 C.F.R. § 416.905(a).

The ALJ employs a five-step sequential evaluation process to assess a claim for disability benefits. See id. §§ 404.1520(a)(4)(i)-(v), 404.1594. The evaluation may be concluded at any step in the process if it is determined that the claimant is or is not disabled. Id. § 404.1520(a)(4). The steps are: (1) if the claimant is engaged in substantial gainful work activity, the application is denied; (2) if the claimant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; (3) if the claimant's impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; (4) if the claimant's residual functional capacity is such that he or she can still perform past relevant work, then the application is denied; (5) if the claimant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.; Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

A plaintiff challenging an ALJ's RFC determination has the burden to identify specific limitations that the ALJ erroneously excluded. See West v. Berryhill, No. 17-1170, 2017 WL 6499834, at *1 (1st Cir. Dec. 11, 2017) ("[Plaintiff] had the burden of establishing his RFC." (citing Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982))).

For any claims filed on March 27, 2017 or later, an ALJ will not give any specific evidentiary weight to any medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c. Under this new regulation, Nurse Practitioners are considered acceptable medical sources. See Raposo v. Berryhill, No. 17-cv-10308, 2018 WL 1524570, at *8 (D. Mass. Mar. 28, 2018) ("[N]urse practitioner[s are] considered an acceptable medical source for claims filed 'on or after March 27, 2017.'" (citing 20 C.F.R. § 416.902(a)(7))). The ALJ will consider a medical source's medical opinions or prior administrative medical findings based on the following factors: supportability, consistency, relationship with claimant, specialization, and other factors. 20 C.F.R. § 404.1520c.

## II.  <u>Standard of Review</u>

The Court may set aside the ALJ's decision if it resulted from legal error or if the factual findings were not supported by substantial evidence. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The Court reviews the ALJ's conclusions of law de novo. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). "Failure of the [ALJ] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [ALJ] applied the correct legal standards are grounds for reversal." Weiler v. Shalala, 922 F. Supp. 689, 694

(D. Mass. 1996) (citing <u>Wiggins v. Schweiker</u>, 679 F.2d 1387, 1389 (11th Cir. 1982)).

For findings of fact, "even if the record arguably could justify a different conclusion," the Court must affirm the decision "so long as it is supported by substantial evidence." <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence does not exist when the ALJ's factual findings are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." <u>Nguyen</u>, 172 F.3d at 35. The Court examines the record in its entirety to determine the weight and "substantiality" of the evidence. <u>Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 306 (D. Mass. 1998).

## DISCUSSION

Plaintiff argues that the ALJ's RFC findings with respect to her mental capacity were not supported by substantial evidence. Docket No. 11 at 9. Specifically, Plaintiff contends that the ALJ erred in his evaluation of Nurse Practitioner Olivier's opinion by failing to properly consider the factors prescribed in 20 C.F.R. § 404.1520c. <u>Id.</u> at 10. The government

argues that the ALJ's RFC findings were supported by substantial evidence, including the opinions of non-treating physicians.

The Social Security Administration has promulgated a new regulation that affects claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c; see also Purdy v. Berryhill, 887 F.3d 7, 13 n.8 (1st Cir. 2018). This new regulation applies here, because Plaintiff's claim was filed on March 19, 2018. The regulation provides that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The ALJ must evaluate the persuasiveness of each medical source but is not required to assigned specific to every medical opinion. 20 C.F.R. 404.1520c(b)(1). The ALJ must explain how he "considered the supportability and consistency" of a medical source's opinions. Id. § 4040.1520c(b)(2)-(c). He must consider other factors such as relationship with the claimant, length of the treatment relationship, and specialization, but he is not required to explain how he considered those factors. Id.

The ALJ's evaluations of medical opinions conform to this new framework. The ALJ was not required to give dispositive weight to Nurse Practitioner Olivier's conclusion regarding Plaintiff's ability to work, even though she had treated

Plaintiff for nine years. The ALJ assessed the Nurse Practitioner's opinion to be "partially persuasive." R. 27. As required by regulation, the ALJ based this assessment on the supportability and consistency of Nurse Olivier's opinion. Specifically, the ALJ found the Nurse Practitioner's opinion that Plaintiff had more than a moderate degree of mental restriction to be unsupported by and inconsistent with (1) the Plaintiff's "conservative and partially effective treatment history," (2) the Nurse Practitioner's "limited findings upon mental status examination," and (3) the Plaintiff's "strong range of reported daily activities." R.28.

First, the record supports the ALJ's finding that Plaintiff had a conservative and partially effective treatment history. See Dwyer v. Astrue, No. 11-12048, 2013 WL 3965398, *8 (D. Mass. July 31, 2013) (explaining that a conservative treatment history can be considered in evaluating Plaintiff's assertions of limiting disability). As the ALJ noted, Plaintiff's mental ailments had been treated with therapy and a "modest dose" of medications since December 14, 2017. See R. 637 (noting that Plaintiff had been prescribed a "modest dose of Lexapro 5mg and [a] small dose of Xanax"). Plaintiff's physical symptoms were also treated conservatively, with the record indicating that they were "slowly improving." R. 621.

Second, the record supports the ALJ's consideration of the Nurse Practitioner's limited findings upon mental status evaluation. The Nurse Practitioner's records consistently reflect that Plaintiff had mild to moderate mental restrictions, and a GAF score of 55. In the extensive record of Plaintiff's treatment history, the Nurse Practitioner found Plaintiff to have normal appearance, thought process, insight, judgement, memory, attention and concentration at nearly every appointment. R. 319-320, 324, 329, 435, 441, 445, 450, 460, 520, 525, 552, 555, 559, 563-64. See Lacroix v. Barnhart, 352 F. Supp. 2d 100, 112 (D. Mass. 2005)("Emphasizing clinical findings over [the medical] questionnaire is . . . perfectly reasonable."); see also MacNeil v. Astrue, 908 F. Supp. 2d 259, 266 (D. Mass. 2012) (holding that findings of intact memory and attention undercut treating physician's opinion that claimant had a "moderately severe" limitation in that area).

Third, the ALJ did not err by discounting the Nurse Practitioner's medical opinion due to Plaintiff's self-reported daily activities. See Sanchez v. Colvin, 134 F. Supp. 3d 605, 616 n.6 (D. Mass. 2015) (holding that hearing officers may consider plaintiffs' own statements regarding their daily activities to discount treating doctor's opinion). Here, Plaintiff submitted a February 2018 function report in which she described completing several activities, including planting

flowers, washing dishes, watching television, and cooking for
herself. The record supports the ALJ's assessment that the Nurse
Practitioner's medical opinion was only partially persuasive.

The record also supports the ALJ's conclusion that the
opinions of Drs. Warren and McKenna are persuasive. Plaintiff
provides no support for her claim that Drs. Warren and McKenna
gave "inadequate consideration" to Plaintiff's medical records.
Docket No. 11 at 12. The ALJ properly found that the opinions of
Drs. Warren and McKenna are consistent with the record as a
whole.

Finally, substantial evidence supports the ALJ's RFC
determination. The ALJ found Plaintiff to have severe mental
impairments, but no severe physical impairments. Nevertheless,
the ALJ gave the Plaintiff's "subjective allegations"
the "benefit of the doubt" by "account[ing] for a range of
postural and environmental limitations" in his RFC
determination. R. 27. To the extent the Plaintiff desires
additional RFC limitations, she has failed to establish them.
See West v. Berryhill, No. 17-1170, 2017 WL 6499834, at *1 (1st
Cir. Dec. 11, 2017) ("[Plaintiff] has the burden of establishing
his RFC." (citing Goodermote v. Sec'y of Health & Human Servs.,
690 F.2d 5, 7 (1st Cir. 1982))).

## ORDER

The Court **DENIES** Plaintiff's motion to reverse the decision of the Commissioner (Docket No. 10). The Court **ALLOWS** Defendant's motion to affirm the Commissioner's decision (Docket No. 13).

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge